IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KEVIN GRAY and MARSHA GRAY,

Plaintiffs,

vs.                                          Case No. 00-3133-JTM

L.E. BRUCE, et al.,

Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendants' Motion for Summary Judgment (Dkt.

No. 55).  After reviewing the parties' arguments, the court grants in part and denies in part defendants'

motion.

## I. PROCEDURAL HISTORY

Inmate Kevin Gray and his non-inmate spouse Marsha Gray brought separate actions against

the above named defendants for events arising out of Mrs. Gray's attempt to visit her husband on

November 13, 1999 during Mr. Gray's incarceration at Hutchinson Correctional Facility (hereafter

"HCF").  The district court consolidated the complaints and dismissed the actions on March 15, 2001.

Plaintiffs appealed to the Tenth Circuit, which found that the action had been prematurely dismissed.  In

an order filed with the district court on January 7, 2002, the Tenth Circuit held: 1) that Mrs. Gray had

alleged sufficient facts to state a claim for an unreasonable search under the Fourth Amendment; 2) that

the Grays had alleged sufficient facts to bring a claim for an Equal Protection violation based on race; and 3) that the district court should address whether the swab search violated Mrs. Gray's Fifth Amendment right to be free from self-incrimination.

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

2

(1986).

### III. FINDINGS OF FACT[1]

Plaintiff, Kevin Gray, is an inmate legally incarcerated in the custody of the Secretary of

Corrections, State of Kansas, serving a sentence for the crimes of rape and attempted rape. Plaintiff

was housed at the Central Unit of the Hutchinson Correctional Facility when he filed the complaint in

1999, and presently resides at the Ellsworth Correctional Facility having been moved there on

November 6, 2003. (Exhibit 1)

Plaintiff, Marsha Gray, is believed to presently reside at 210 S. Washington Avenue in Burns,

Kansas.

Defendant Louis E. Bruce is the Warden of the Hutchinson Correctional Facility and states as

follows:

I am the warden at the Hutchinson Correctional Facility and became so employed at this facility in August of 1999, although I became employed with the Kansas Department of Corrections in October of 1980 and have previously served at other correctional facilities in the state in most security and administrative capacities and most recently as a Deputy Secretary of Corrections, prior to coming to HCF.

I am aware of the circumstance of inmate Gray and of his wife Marsha Gray involving an alert on Mrs. Gray on November 13, 1999, on the Ion Track Itemizer machine which gave a positive indication for heroin.

I am aware that Mrs. Gray was then offered the opportunity to submit to either a backscatter body scan or to a strip search and that she refused both.

I am aware the Mrs. Gray asked what drug was indicated by the machine, refused the

---

[1] The court sets out the facts as presented in the <u>Martinez</u> Report and submitted by the moving party.  All excerpts from prison documents have been left as they were originally submitted.  Minor corrections have been made for the sake of clarity.

opportunity to submit to either a backscatter body scan or to a strip search and, upon a successful completion of that search, to enjoy a non-contact visit with her husband. Instead, Mrs. Gray chose to leave the facility, being fully aware that she could lose her visiting privileges for one year, as provided by policy.

Mrs. Gray chose to leave without a search and her visitations privileges were indeed suspended for a period of one year, as provided for by policy.

I understand that the Grays are maintaining that other inmates were treated more preferably than the Grays regarding the impact on visitation privileges of a positive alert from the Itemizer

The concern about inmate visitors smuggling drugs and other contraband into the facility directly relates to the safety and security of the facility. The type of search conducted on Mrs. Gray was non intrusive, being only a skin swab, and the further proposed search needed only to be a fully clothed body scan which would be visible to no one else but a same sex viewer. Mrs. Gray submitted without objection to the initial swab test and refused the secondary test. She was advised that her refusal could result in a suspension of her visitation privileges for up to a year, and she proceeded to leave anyway.

I did not consider the race of plaintiffs in approving the one year suspension of Plaintiff Mrs. Gray's privilege to visit her husband in person while he remained incarcerated with the Kansas Department of Corrections. I doubt I had any idea of the race of either plaintiff when I reviewed the request to suspend her visits for a year and did so. Race is simply not something to be considered in regard to the granting, modification or suspension of visiting privileges.

Mr. and Mrs. Gray received fair treatment regarding their visiting privileges in light of facility policies, in light of their lengthy record of malfeasance and in light of the security concerns of the facility.

Any actions I took or did not take were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or nonbusiness capacity.

Defendant Mary E. Nelson, is the Lieutenant of Intelligence and Investigations Department at

the Hutchinson Correctional Facility and states as follows:

I am presently employed as Lieutenant of the Intelligence and Investigations Department at the Hutchinson Correctional Facility. At the time the facts arose upon which the Gray's claims are based, I was a Master Sergeant in the same department at the same facility. I have been employed with the Department of Corrections since December 1986. I received a Bachelor of

Science degree in Health, Physical Education and Recreation from Fort Hays State University in 1979, a Master's degree in Recreation and Parks Administration from Eastern Kentucky University in 1982 and a second Master's degree in Administration of Justice from Wichita State University in 1995.

I was involved with the application by the Hutchinson Correctional Facility to the federal government for a drug interdiction grant. The grant was approved and the Ion Track machine, also known as the Itemiser and the Backscatter machine were both purchased with such grant money and were involved in fulfilling the requirements of the grant given to the facility. After the grant had been awarded to the facility, I was involved with the implementation of the grant and the operation of the resultant program of drug interdiction.

The initial test from the Ion Track was nothing more intrusive than drawing a small sampling pad across the subject's arm or hand. The pad was then placed in the Itemizer and was checked for traces of certain drugs.

The Ion Track was one of two similar types of machines considered for use at the Hutchinson Correctional Facility in connection with the grant. Previous warden Robert Hannigan decided which one would be used after returning to the facility after viewing them both in operation.

The Ion Track machine is not a device which establishes the guilt or innocence of someone in regard to their contact with the substances for which detection is being sought, but is instead one of many tools available to focus or to relieve suspicion. The fact that someone alerts for a given substance does not mean they presently or recently possessed a controlled substance. It does mean that the machine has detected ions of the specified substance on the hand of the person and that further investigation is appropriate before permitting the visitor to enter the secured area of the correctional facility.

Upon the receipt of a positive scan result, the subject would then be offered a choice of submitting to a strip search or a clothed full-body scan by the Backscatter machine, which scan would indicate the presence of any unusual items on or in the person being scanned. The backscatter machine, a minimally invasive way to search someone, especially as compared to a strip search, is an x-ray type machine which takes a picture of the subject person and shows the presence of things concealed underneath clothing or inserted into the body.

If the subject of the alert passes the scan or strip search, he or she would be permitted to have a non-contact visit that day and would return to normal contact visits the next time, assuming the inmate was entitled to contact visits and assuming the visitor passed the Ion Track machine test the next time she visited. The visitor would also be told that if he or she left without submitting to a search that their visitation privileges would be requested to be suspended for one year.

5

I conducted an investigation into an alert at the Central Unit of the Hutchinson Correctional Facility on Plaintiff Mrs. Marsha Gray on November 13, 1999, on the Ion Track machine which gave a positive indication for heroin.

I told Mrs. Gray that the machine had alerted on her for drugs, but that we were not accusing her of using drugs or of having drugs in her possession. She asked me what drug the machine had alerted to and I told her "heroin"

At that point Mrs. Gray turned from me, walked directly to Corporal Dalke, who was working the gatehouse security post, and requested the return of her driver's license, which was left as a part of the visitation procedure.

Mrs. Gray then stated something to the effect that "I am leaving" and exited the building and drove out of the parking lot. It was and is facility policy to permit a visitor to leave the gatehouse without being detained, but with the expectation that leaving may impact the visitor's privileges regarding the facility for a period of time.

She then contacted her husband's Unit Team person, Charles Rudicel, by telephone, discussed the matter with him, advising that she refused the search by leaving the gatehouse after the Ion Track machine alerted on her and asking to talk with her husband, plaintiff Kevin Gray.

Because I regarded Mrs. Gray's rapid departure from the facility without submitting to a further search a refusal, I requested the Warden to remove Mrs. Gray from Mr. Gray's visiting list for one year, as is permitted by state regulation, department policy and facility order.

Mrs. Gray chose to leave without a search and her visitations privileges were suspended by the Warden for a period of one year, as provided for by Kansas Administrative Regulation 44-7-104(a)(8). Other relevant policies which direct the same result include Hutchinson Correctional Facility General Orders 9-107 and 16-101, and Internal Management Policy and Procedures 10-113 and 12-115

Any actions I took or did not take were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or nonbusiness capacity.

Defendant Charles E. Simmons is the Deputy Secretary of Facilities Management of the State

of Kansas Department of Corrections and states as follows:

At all times relevant to Plaintiffs claim I was employed as the Secretary of Corrections for the State of Kansas Department of Corrections.

6

I am ultimately responsible for policies and actions of the Kansas Department of Corrections, but have had no direct contact with plaintiff Kevin Gray #43848 or with the matters in his petition regarding complaints about the suspension of visiting privileges of his wife, plaintiff Marsha Gray, due to an alert on her relating to illegal drugs at the time she was attempting to enter the Hutchinson Correctional Facility on November 13, 1999, to visit with plaintiff Kevin Gray.

Mr. Gray did send a grievance to my office, but my designee responded to it in lieu of my direct involvement.

Any actions I took or did not take regarding either petitioner in November of 1999 were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity.

Defendant William Cummings is a Corrections Manager II for the State of Kansas Department of Corrections and states as follows:

My name is William Cummings and at all times material hereto I have acted as the Secretary of Corrections designee for the purpose of responding to plaintiff Kevin Gray's grievance regarding the implementation and enforcement of the rules regarding the suspension of plaintiff's visitation privileges for a year.

I had no direct involvement with the underlying subject matter of Mr. & Mrs. Gray's complaints and only responded to the single grievance appeal, which reached central office.

In the matter of responding to Plaintiff Kevin Gray's grievance appeal in grievance Number BA00008488, I was not directly involved with the decision making but only in reviewing the underlying decisions as the Secretary's designee.

Any actions I took or did not take regarding either plaintiff in November of 1999 were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity.

Defendant Sam Cline is the Warden of the Ellsworth Correctional Facility and states as follows:

During November of 1999[,] I was employed as a Deputy Warden at the Hutchinson Correctional Facility. I first began working at the facility as a corrections officer in 1982 and continued in a variety of roles including deputy warden of Programs and later of Operations at HCF from 1999 until August 1, 2003, when I was promoted to the position of Warden III at

the Ellsworth Correctional Facility.

I was involved with the effort of the facility to obtain a federal drug interdiction grant and served as the program director once the grant was received. The two machines in use at the central unit of the Hutchinson Correctional Facility, the Ion Track Itemiser and the Backscatter machines, were purchased through the funding provided from the drug interdiction grant. Mary Nelson handled the implementation of the program and was the person who conducted the day to day operations.

I know petitioner Kevin Gray who is presently housed at the Ellsworth Correctional Facility where I am the warden; while conducting my duties I do see Mr. Gray occasionally. Looking back to November of 1999, I can recall that inmate Gray was familiar to me with issues related to inappropriate conduct while in visitation. These issues were managed through the disciplinary process as I recall. I also remember that I was phoned by Mrs. Gray and discussed with her the issues and outcomes regarding their visitation privileges. I have not met Mrs. Gray personally.

I was indirectly involved in the decision to suspend visits of the petitioners at the facility in November of 1999 and was not directly involved with the subject matter of their lawsuit to the best of my recollection. I certainly did not make any decisions regarding the petitioners based on the race of either person, nor on the matter that the two of them were married to each other.

Any actions I took or did not take at the Hutchinson Correctional Facility regarding either petitioner in November of 1999 were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity.

Plaintiff Kevin Gray pursued the grievance procedure regarding the subject matter of his

complaint in grievance BA00008488 dated December 15, 1999, resulting in the following grievance

and the responses from the state as follows:

## A. PETITIONER'S GRIEVANCE

"On Oct. 31, 1999, my wife and I was told by Sgt. Hurt we could not correct our granddaughter, which was by making her sit in a chair at our table for time out. According to the visitors Handbook, "Parents or guardians are responsible for the supervision and behavior of their children. Your visit will be terminated if your children are being disruptive in any manner." She is only three years old and we do try to make her mind, but it is really hard to keep her still. Sgt. Hurt told us that if we did not stop doing what we were to her (our granddaughter) our visit would be terminated. So my wife and I let her run around. Sgt. Hurt

8

wrote a narrative on this matter. On No. 7, 1999, my wife left early check in which is at 11:00 a.m., so [s]he could take some Ibuprofin (sic) for her magraine (sic). Again the vistors handbook states: "Visitors are allowed to leave before noon and are allowed to return again at noon. But if they depart after noon hour the visit is over for the day." My wife return at the afternoon check in which is at 11:30 a.m., which the Handbook states again, "Visitors are allowed to check in 30 minutes prior to the start of the visiting period which is at 12:00 noon." My wife checked in at the gatehouse and went to the outside visiting area, she found a table and told her that I was a level 2 and that I left so that meant that she could not come back in and she would have to leave. Sgt. Hurt also wrote a narrative on this also. Two days later, I found out that Sgt. Hurt had enforced a rule that hadn't even been published yet. In Sgt. Hurt narrative, she said that my wife threw her visitor pass at an officer Dane and hit her in the foot. Officer Dane was asked about this, and she said she didn't say that. On Nov. 11, 1999, this was a good day, my wife and I had no problems because Sgt. Hurt was not in the visiting room. On November 13, 1999, the day my visits were taken from me and my wife for one year my wife refused to be stripped search and x-rayed, being subject of unlawful and unconstitutional strip search of person via x-ray machine without due process and without probably cause and without search warrant being issued by a neutral and detached magistrate violations of the 4, 5, 6 and 14 Amendment of the U.S. Constitution. HCF has a machine called an Ion Drug Scanning machine which can tell if you have been using drugs or any kind of medication. My wife was also subject of unlawful and unconstitutional seizure of bodily fluids from her person without due process, without probable cause to unlawful and unconstitutional of search and seizures by virtue of defendant fraudulent activivites of misleading my wife to think all outside visitor must submit to and be strip searched via x-ray machines and that all outside visitor must submit to seizure of bodily fluids via drug swabbing test. Activities conducted by I & I (Mary Nelson) HCF security official as a pre request to being allowed by Kansas law to visit friends, family and loves one incarcerated under the jurisdiction of KDOC all in violation of 4, 5, 6 and 14th Amendment of U.S. Constitution. The event on Nov. 13, 1999 was nothing but retaliation because I was able to prove that Sgt. Hurt did my wife and I, wrong by not letting us visit that afternoon. A memo came out a couple days later enforcing the old visiting rule book until the new one is published. My wife has been coming to HCF-C for some time now and not once has she had any problems with the Ion machine since they have had it in here, which is about a year I believe until now. The letter I received from Mr. Bruce gave nothing pursuant to IMPP's or General Orders, he gives no reason. I know of other visitors that refused to be searched and or x-rayed, some did not lose their visits, others lost their visits, but not as long as me or my wife did. David Partridge, his parents refused, didn't lose their visits, Eddie Lowrance, his wife refused, lost their for 6 months, Harvey O'Conner his wife refused, lost their for four months, Harvey was also rolled form the south unit for having green money in his shoe after a visit, still have his visit till this day. Scott Riener his woman large amount of marijuana, but they never lost their either and myself and my wife, we lost our visit for 1 year of the five men four and their visitors are white, but myself, I'm Black and my wife is white, which subject my wife and myself to unlawful and unconstitutional pusishment (sic) and

treatment, suspension of myself and my wife visiting privileges and consortium rights with my wife and her with me, for one year cause of and for my wife refusal to submit to Mary Nelson (I & I) unlawful, unconstitutional search of my wife body anatomy via by use of x-ray machine, without probable cause without due process and without search warrant being issued by netural and detached magistrate in violation of 4, 5, 6 and $_{14}$th Amendments of U.S. Constitution. I have shown a pattern of harassment favoritism and racism. The favoritism comes in when the Ion machines goes off and they go through your unlawful and unconstitutional x-ray, some people have non-contact visits, and other, they just let them on through the only prison that has this machine is Hutchinson, Lansing had one but lost it and El Dorado has never had one. Unit Team McLaurine CCII tested positive for cocaine and according to your Policy, for officers and staff, if they test positive on the Ion machine for any kind of drug they are suspended for 3 days with pay and when they return to work, take a urine test. Why wasn't Unit Team McLaurine suspended? And why didn't he have to give a urine test? Favoritism! Also on 1 1/20/99m and 11/26/99, my daughter and my granddaughter came to see me,on both of those days the Ion machine was down and so was the x-ray machine. This seems rather strange to me. David Logan who is out at the East, his wife also tested positive, I think cocaine, I'm not sure, But anyway, she was strip search, then left and when she came back, was strip search again, but after that visit, he lost his visit for 90 days, I don't understand why I got a year. Inmate Ronnie Relf, who Aunt brings up his two daughters, she tested positive on the machine. Mr. Relf received a non-contact visit, Mr. Bill Tucker, Jr. daughter and grandson, his daughter tested positive for heroin, but she was allowed to come visit her father. The list goes on and one my wife wrote you a letter on 11/22/99, in that letter is only a few names in their, their are more names but with these names, we have shown what we need to show. If you will look further in this matter, you will see what we were saying, like my wife, I would like this matter to be resolved."

## B. GRIEVANCE RESPONSE BY UNIT TEAM

The grievance was handled by Unit Team member Garwood, which response dated December 10, 1999, stated as follows:

"In your grievance dated 12-3-00, you say that on October 31, 1999, you were warned by the visiting officers about how you were correcting your granddaughter's behavior during the visit with your wife. Secondly, you express your displeasure about your wife not being allowed to visit you the afternoon of November 7, 1999, because she had visited you that morning and had left the premises, returning at approximately 11:30 a.m. to continue her visit with you. Thirdly, you are questioning why your visits with your wife have been suspended for one year when other inmates received lesser suspensions for violations of the visiting policy. Finally, you state that the use of the bodyscan or X-ray machine for body searches is unconstitutional.

First the officers acted appropriately when they warned you about the excessive disciplining of

10

your granddaughter. Secondly, the Hutchinson Correctional Facility visiting policy states that once visitors leave the premises after a visit, they are not allowed to return to visit that day. HCF General Order #16-101, Inmate Visiting, specifies that if any visitor refuses to be searched, that person may be prohibited from visiting any HCF facility for a specified period of time in accordance with JMPP 12-115, Search of Visitors. It was determined by the warden, in this case, that the period of suspension should be one year. Finally, HCF recently obtained the bodyscan machine through a federal drug interdiction grant, and is presently the only facility in Kansas to have one. The machine enhances the ability for officers to detect the presence of drugs on the person of visitors coming into the facility. The monitor is positioned so that only the operator of the machine can see it. HCF will continue to monitor visitors for the possible introduction of contraband, in accordance with existing policy.

In regard to your concern about how employees are discipline for violation of policy, this is a matter that is investigated and decided by the warden, and any findings are necessarily confidential. Decisions for disciplinary action are made on a case-by-case basis, regardless if it involves an inmate or a staff member.

No further action is warranted."

## C. WARDEN'S RESPONSE

Plaintiff was not satisfied with that response and appealed the matter to the Warden on December 14,

1999. Warden Bruce responded as follows:

"FINDING OF FACT - I have reviewed the response provided to you by your unit team on the above reference matter.

CONCLUSIONS — Please be advised that my office concurs with the response of your unit team and the unit team's response shall serve as my final response to this grievance.

ACTION TAKEN — None warranted. If you are not happy with my position on this matter you have the right to appeal this grievance to the Secretary of Corrections office within three (3) days of being notified of this decision."

Plaintiff then appealed the matter to the Secretary of Corrections on December 21, 1999, stating as

follows:

"The Principal Administrator should of looked into this matter much further than he did, but

11

since he didn't the problem is still there. 1) If the visiting officers thought if I was excessive disciplining my granddaughter then why wasn't my visit terminated? Because according to the vistor (sic) handbook: "Parents or guardians are <u>responsible</u> for the supervision and <u>behavior</u> of their children. Your visit will be <u>terminated</u> if your children are being disruptive in any manner. 2) HCF visiting policy, with this new rule about once you leave you can't come back, well this started 12/1/99, when this happened to me, it was 11/7/99, the old rule was still in, you can leave, as long as it was before 12:00 pm and return, a memo was put out, this would still be in affect until the new policy was out. 3) its awful funny, that certain people that the warden determine to suspend visit for a year, happen to be 90% black inmates, and most of the white inmate lost their for 4 to 6 months. And certain employee, who are white can do what they want? Why do HCF have any Policy? They don't follow them until they want to! If my visit was suspended for a 1 year, they should have been for 6 months instead. If that, If you going to do it for the white inmates then do it for us also. All I'm asking lets be fair about this, if we are going to be fair!"

## D. SECRETARY OF CORRECTIONS' RESPONSE

The Secretary of Corrections' designee, William L. Cummings, responded in grievance #BA00008488

on December 23, 1999, as follows:

"<u>FINDINGS OF</u> <u>FACT</u>

The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response.

On appeal, the inmate offers no evidence or argument that suggests that the response provided to the inmate by staff at the facility is wrong.

<u>CONCLUSIONS</u> <u>MADE</u>

The response provided by the warden is appropriate.

<u>ACTION</u> <u>TAKEN</u>

None further."

Kansas Administrative Regulation 44-7-104 addresses inmate visitation and searches of

visitors. The current version of the rule has been in effect since 1994.  Internal Management Policy and

Procedure 10-113, which was in effect on November 13, 1999, addresses Inmate Visitation, including

termination and suspension of visits and visitor searches.  Internal Management Policy and Procedure 12-115, which was in effect on November 13, 1999, addresses visitor searches.  Hutchinson Correctional Facility General Order 09-107, which was in effect on November 13, 1999, proscribes the drug interdiction procedures followed at the Hutchinson Correctional Facility, including screening and strip searches.  Hutchinson Correctional Facility General Order 16-101, which was in effect on November 13, 1999, addresses inmate visiting, including visiting hours, contraband, search of visitors, and violations.

Mrs. Gray, up to the time of her refusal, had a history with the department of corrections, as did her husband, co-plaintiff Kevin Gray.

A. Mrs. Gray, then known as Struckman, but whose name appeared as Stewart on the subsequent marriage license, was a correctional officer at the El Dorado Correctional Facility until she was terminated on January 14, 1993, for unsatisfactory work performance, because she developed a relationship with Kevin Gray.

B. December 9, 1993, inmate Gray failed a urine test and pled guilty to using drugs. He received a sentence of 7 days disciplinary segregation, paid $3.90 as restitution for the drug test and had his contact visits terminated for 90 days.

C. In April of 1994, Mrs. Gray sought permission from the warden at the El Dorado Correctional Facility to marry Kevin Gray in a ceremony at the facility, but was denied because they had not attended three marriage preparation counseling sessions and because the two year prohibition against a former staff member visiting an inmate had not expired. They were subsequently married on June 20, 1995.

D. October 7, 1995, Mrs. Gray was stopped at the control center, due to intelligence received by investigators. Mrs. Gray admitted that she, at her husband's request, was attempting to bring two balloons of drugs into the facility. Mr. Gray received a disciplinary report for this attempt and was sentenced to 21 days disciplinary segregation, 30 days restriction, 3 months loss of good time and a $20 fine. Additionally, Mrs. Gray's visiting privileges were suspended for a year.

E. September 11, 1997, Mr. Gray was written a disciplinary report for use of stimulants

13

because his urine tested positive for drugs, specifically THC. He was convicted as charged and was sentenced to 14 days disciplinary segregation, 30 days restriction, 3 months loss of good time and a $20 fine. Again, his contact visitation privileges were suspended for 90 days.

F. In early 1998 Mr. Gray was written a disciplinary report for use of stimulants, in case 8-03-093, which was dismissed on March 12, 1998, for an unknown reason. Mr. and Mrs. Gray both complained about the report being written, even though it was dismissed.

G. On April 17, 1999, Mr. Gray was written a disciplinary report for disobeying orders and for lewd acts arising out of the event of Mrs. Gray masturbating him to climax in the visiting room, while in the proximity of other visitors and of Mrs. Gray's two year old granddaughter. Mrs. Gray's visit was terminated and Mr. Gray was placed on non-contact visits for 90 days. He also received a sentence of 14 days disciplinary segregation (suspended for 90 days), 30 days restriction and 3 months loss of good time.

H. On October 24, 1999, Mr. Gray was noted as behaving inappropriately with Mrs. Gray's two year old granddaughter, by grabbing her, slapping at her face, cursing at her and poking his fingers in the child's face.

I. Then came the event of November 13, 1999, in which Mrs. Gray had the Itemizer alert on her for heroin and then refused any further search and left, even though she knew the investigating officer would request that Mrs. Gray be removed from Mr. Gray's visiting list for a year.

Plaintiff Kevin Gray's central file for the time in custody preceding November 13, 1999,

included suspensions related to drug use and other disciplinary matters:

A. December 9, 1993, the file reflects that Petitioner was placed on non-contact visits for a minimum of 90 days after a positive drug screen.

B. The petitioners sought permission from the warden at the El Dorado Correctional Facility for them to be married in April of 1994, but petitioner Marcia Gray was advised that because she had been employed as a correctional officer at that facility that she would have to wait the mandatory two years before she could visit at the facility to become married to petitioner Kevin Gray, although Marcia was advised that she could achieve the goal of becoming married to Kevin by common law or by proxy. The parties were married by Judge William F. Lyle at the Hutchinson Correctional Facility on June 20, 1995.

C. On October 7, 1995, Petitioners were involved with a scheme to smuggle drugs into the prison and visitation between the two was suspended for one year.

14

D. On September 11, 1997 petitioner Kevin Gray failed a drug screen and received a disciplinary report for use of stimulants. He was advised that contact visitation with his visitors was suspended for 90 days.

E. In March of 1998 petitioner was charged with use of stimulants in case 08-03-093, which case was subsequently dismissed and is known of only because of Plaintiffs' complaints.

F. March 17, 1999, petitioner Kevin Gray was charged with disciplinary rule violations for disobeying orders and for lewd acts, both relating to the act of Petitioner Marsha Gray apparently masturbating him during a contact visit. Petitioner was convicted as charged and was placed on 90 days non-contact visits.

G. April 23, 2001, petitioner Kevin Gray's status that he would receive only non-contact visits for a year (September 26, 2000 to September 26, 2001) due to his conviction for use of stimulants, his second such conviction in a three year period.

H. May 6, 2003, petitioner Marsha Gray was denied visiting privileges with petitioner Kevin Gray while he was housed at the Lansing Correctional Facility. The denial was attributed to the fact [that] while petitioner Marsha Gray was an employee with the state of Kansas that she established the relationship with an inmate, petitioner Kevin Gray, and that it would not be in the best interest of the facility to approve such visits.

In response to plaintiffs' allegations of disparate treatment as compared to others who may have had an alert from the Ion Tracker machine, the defendants submitted the following documentation:

A. A special investigations file was prepared by Mary Nelson regarding the incident involving plaintiffs on November 13, 1999.

B. Inmate Harvey O'Connell's wife Sarah came to the Hutchinson Correctional Facility for a visit on February 10, 1999. She was being watched as possibly trying to smuggle drugs into the facility. She initially indicated in the gatehouse while waiting to enter and to visit her husband that she had forgotten her identification in the vehicle. She was accompanied back to the vehicle and could not find it. The officer accompanying her authorized her to return home to get the ID and to return. Upon returning she was advised that her visit was terminated. She was subsequently advised that her visiting privileges with her husband were suspended for 6 months. When the warden came to know that Mrs. O'Connell had not refused to submit to a search, but was permitted to leave by the officer, the visitation was reinstated on a non-contact basis for 6 months.

15

C. Inmate Eddie Lowence's wife, Mary Brooks, had a canine alert on her February 6, 1999. Upon refusing a search, Mrs. Brooks' visiting privileges were suspended for a year. Sometime later, limited privileges were reinstated so that non-contact visits were permitted for 6 months.

D. Inmate David Partridge's visitor, John Partridge, had a positive alert for PCP through the Jon Track machine on August 1, 1999. The visitor submitted to a Backscatter search, had a negative result, and was permitted a non-contact visit.

E. Inmate Jimmy Searles' wife Donna alerted on the Ion Track machine on August 3, 1999, for EDME. She submitted to a Backscatter search, with negative findings, and a non-contact visit was established.

F. Inmate Ronnie Relf's visitor, ReginLynn McCoy had an Ion Track alert for morphine on October 31, 1999. She consented to a backscatter machine search with negative results and a non-contact visit was established.

G. Inmate Scott Reiner's visitor, Patty Atherton, came to visit on January 6, 1999. After Atherton left the visitor's bathroom 5 balloons containing marijuana were found in the restroom. It was believed that Ms. Atherton introduced the drug into the restroom as a part of a smuggling operation. Atherton's visiting privileges were suspended for a year.

H. Inmate Bill Tucker's visitor Cherrie Stevenson had an Ion Track alert for cocaine on November 13, 1999. She consented to a backscatter search with negative results and was permitted a non- contact visit.

Mr. Tucker filed a grievance about the incident, complaining among other things that the backscatter search was conducted in full view of everyone and was embarrassing. The report provided by Mary Nelson and the grievance response indicated that, although it was possible for an observer to watch the event of the backscatter search being conducted, the video of the search was concealed in a cabinet and was not visible to anyone except the operator who was the same gender as the subject.

I. Facility employee William McLaurine on August 10, 1999, alerted on the Ion Track machine for cocaine. He submitted to a backscatter search and was placed on administrative leave until the result of a urine analysis were returned to the facility human resources department.

J. David Logan's visitor, wife Merrile, alerted on the Ion Track machine for cocaine at the East Unit of the Hutchinson Correctional Facility. She consented to a strip search, with negative results. Because the East Unit does not have non-contact visiting rooms, a contact visit was permitted close to the observing officers.

Defendants submitted literature for the Backscatter machine and relevant portion of the operating manual for the Ion Tracker Machine and operating procedures utilized by the Hutchinson Correctional Facility during the time frame of plaintiffs' complaints.

## IV. ANALYSIS

## A. Whether Prison Officials Subjected Ms. Gray to an Unreasonable Search under the Fourth Amendment

The Fourth Amendment protects persons against searches and seizures that are executed without probable cause and a warrant.  U.S. Const. amend. IV.  In the context of a prison environment, the standard may be lowered to a more general requirement of reasonableness because of prison officials' duty to maintain institutional security by keeping drugs out of a prison.  Romo v. Champion, 46 F.3d 1013, 1017-18 (10th Cir. 1995).  In determining reasonableness, the court examines the context in which the search takes place.  A search will be upheld if it was reasonable under the totality of the circumstances.  Romo, 46 F.3d at 1016; United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993).  The court balances the government's interest in keeping narcotics out of the prison against the intrusion on a plaintiff's privacy interest.  Romo, 46 F.3d at 1017-18.  While prison visitors do maintain some legitimate expectation of privacy, they do not carry with them the "fully panoply of rights they normally enjoy."  Boren v.  Deland, 953 F.2d 987, 988 (10th Cir. 1992) (quoting Blackburn v.  Snow, 771 F.2d 556, 563 (1st Cir. 1985).  A prison visitor does not have a constitutional right to a visitation.  Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 461 (1989).

In preventing the introduction of contraband, the prison should employ the least intrusive means

when they are a reasonable alternative to a search.  See Wayne R. LaFave & David C. Baum, Search and Seizure Section 10.7(b), at 46 (2d ed. 1987).  While the Tenth Circuit has not fully addressed the constitutionality of swab tests in this context, it has acknowledged that swab tests do not amount to per se Fourth Amendment violations.  Gray v. Bruce, 26 Fed. Appx. 819, 823, No. 01-3090, 2001 WL 1580940 (10th Cir. 2001).  See also Giovanniello v. Goord, 2004 WL 2315090, at *5  (W.D.N.Y. Oct.  14, 2004); Gordon v. Nicoletti, 84 F. Supp. 2d 304, 312 (D. Conn. 2000).

Because of a prison's need to maintain security and keep the facility free of drugs, the HCF may reasonably subject visitors to a search for contraband.  Kimball v. Stotts, No. 92-3413-DES, 1993 WL 455266, at *2 (D. Kan. Oct. 27, 1993) (noting that where the prison regulation is clearly related to "stemming the introduction of contraband, including drugs, into the prison, the regulation need only be reasonable, not perfect to pass constitutional muster.").  Here, the swab test is a minimally intrusive method of testing for the presence of drugs on prison visitors.  Gray, 26 Fed. Appx. at 823, 2001 WL 1580940, at *4.

Plaintiff argues that she did not sign a consent form, did not know how reliable the machine was, and did not know the consequences that would follow if the Ion Track Test alerted her.  As to the first argument, there is no requirement that Ms. Gray submit a written consent as long as there is evidence that she gave consent.  Considering her previous visits to the prison facilities, her prior work at prison facilities, and her knowledge of the prison's screening policy designed to reduce the introduction of contraband, Ms. Gray may reasonably be said to have known of the prison's screening process.  Prior to the alert, there is no evidence that Ms. Gray objected to the swab test or resisted the method in

18

which the test was administered, either orally or by her actions.  Any objection to the swab test only

occurred after the test revealed a trace of heroin on her person.  Since Ms. Gray's actions indicate that

she submitted to the Ion Track Test, it may reasonably be concluded that she consented to the swab

test.  See U.S. v. West, 219 F.3d 1171, 1177 (10th Cir. 2000) citing Schneckloth v. Bustamonte,,

412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting that the district court evaluates the

issue of consent under the totality of the circumstances standard).  Furthermore,  Ms. Gray's prompt

departure from the facility also indicates that there was no question of coercion involved in the

submission to the swab test.

The court does not address plaintiff's latter two arguments.  Neither Ms. Gray's knowledge of

the reliability of the machine nor her awareness of the consequences of the Ion Track alert are relevant

to the issue of the reasonableness of the search.

However, directly relevant to the question of reasonableness of the search is Ms. Gray's

allegations as to Lt. Nelson's method of collecting swab samples.  Ms. Gray argues that Lt. Nelson's

method of collecting swab samples lead to cross-contamination and to a false alert.  Lt. Nelson's

affidavit does not address these issues but only provides a summary of how the Ion Track machine was

operated. The court finds this somewhat troubling as the defendants have not addressed the issue of

whether Lt. Nelson took several samples, whether these samples resulted in positive or negative alerts,

why several samples may have been taken, whether Lt. Nelson properly cleaned the Ion Track

Machine after prior use, and whether positive alerts were common with the Ion Track Machine.  See

also Gray, 26 Fed. Appx. at 823, 2001 WL 1580940, at *4 (listing the factors the district court should

consider in Ms. Gray's complaint).  If Lt. Nelson was not properly operating the Ion Track Machine,

19

then the search may be considered unreasonable even though plaintiff initially consented.  Mitchell v.

Department of Corrections, 675 So.2d 162, 165 (Fla. Ct. App. 1996).

Although the court finds that the swab test was a minimally intrusive means to preserve order in

the prison and that Ms. Gray initially consented to the swab test, the court finds that the issue of the

reasonableness of the swab test in this instance is still in question.  Therefore, the court denies summary

judgment on this ground.

## B. Whether the Swab Search Violated Mrs. Gray's Fifth Amendment Right to be Free from Self-Incrimination

The Fifth Amendment privilege protects individuals from self-incrimination.  U.S. Const. amend.

V.  As the court has already set out, the swab test provided a minimally intrusive method of detecting

narcotics that comports with due process.  The swab technique was not designed to determine the guilt

or innocence of anyone alerted but to determine the presence of drug particles and whether further

screening was necessary to prevent possible introduction of drugs into the detention facility.  See, e.g.,

Termunde v. Scovell, 5 F.3d 547, 1993 WL 318828, at *1 (10th Cir. Aug. 19, 1993) (citing

Schmerber v. California, 384 U.S. 757, 761 (1966) ("holding withdrawal of blood for alcohol analysis

is not 'testimonial' or 'communicative'" and therefore does not violate Fifth Amendment privilege.").

Since the alert did not provide testimonial or communicative evidence, the court does not find a Fifth

Amendment violation.

## C. Whether Prison Officials Discriminated Against the Grays on the Basis of their Interracial Marriage in Violation of Equal Protection under the Fourteenth Amendment

To assert a viable equal protection claim, plaintiffs must make a threshold showing that they were treated differently from others similarly situated. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). DiMarco v. Wyoming Dept. of Corrections Div. of Prisons, Wyo. Women's Center, 300 F. Supp. 2d 1183, 1196 (D. Wyo. 2004). The classification must implicate a suspect class or abridge a fundamental right; otherwise the court employs the rational-basis test.  Here, plaintiffs must establish that they are members of a protected class and were subjected to treatment different from those similarly situated.  Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533, (10th Cir. 1998).  However, if the regulation in question neither burdens a fundamental right nor targets a suspect class, the court will uphold the regulation so long as it bears a rational relation to some independent and legitimate end.  Romer v. Evens, 517 U.S. 620, 621, 116 S.Ct. 1620 (1996). Where a regulation is rationally based, the failure to enforce it "with complete equality does not of itself infringe the constitutional principle of equal protection."  D'Acquisto v. Washington, 640 F. Supp. 594, 625 (N.D. Ill. 1986).

Plaintiffs assert that prison officials applied the one year suspension rule to them because they were an interracial couple.  Clearly, race implicates a suspect class that requires a thorough equal protection analysis.  In support of their claim, plaintiffs cite several instances where other couples received lighter sentences for alleged refusal to be searched.  After reviewing plaintiffs' grievance and the Martinez Report, the court finds that the record does not support plaintiffs' assertions.  A substantial number of the prison visitors that plaintiffs cite as receiving less harsh punishment submitted to a second search for drugs that showed that they were not carrying drugs into the prison.  The less harsh treatment was based on the visitors' consent to a subsequent search rather than their status as non-interracial

couples.

The court does not find evidence of racially motivated disparate treatment.  Rather, the court finds that prison officials enforced equally harsh penalties against non-interracial couples. In the case of Ms. Patty Atherton, prison officials found that Ms. Atherton was attempting to bring balloons of marijuana into the prison. The prison suspended Ms. Atherton's visitation privileges for one year.[2]   In the case of Sarah O'Connell, prison officials originally suspended her visits to her husband for six months merely because she had forgotten her identification.  When prison officials later learned that she had not refused a search as originally reported, she was still subject to six months of non-contact visits. In every instance documented where a person was alerted for drugs and submitted to a second search with negative results, the prison visitor was subject to a non-contact visit. Based on the lack of similarity of the situations plaintiffs cite and the generally strict enforcement of prison regulations, the court finds that plaintiffs fail to assert an equal protection claim.

The court also does not find merit in plaintiffs' claim that the one year suspension was racially motivated.  Based on Ms. Gray's conduct,  Lt. Nelson had sufficient grounds to recommend a one year suspension.  Because of Ms. Gray's abrupt refusal to a further search after a positive alert and subsequent departure, Lt. Nelson had grounds to limit visitations. See Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 461 (1989) (noting that there is no constitutional right to visitation). Campbell v. Herman, 941 F.2d 1213 (Table), 1991 WL 164273, at *2 (10th Cir. 1991) citing Evans v. Johnson, 808 F.2d 1427, 1428 (11th Cir. 1987) ("Because a convicted criminal has no absolute

---

[2] The court notes that Ms. Gray also received a one year suspension of visitation rights when she attempted to bring drugs into the prison facility in 1995.

constitutional right to visitation, such privileges are subject to the discretion of prison authorities provided that the restriction of visitation privileges meets some legitimate penological objective.").  On review before Warden Bruce and the Secretary Cummings, there were sufficient grounds to uphold the one year suspension based on Ms. Gray's prior attempt to introduce drugs into the prison facilities.

For the foregoing reasons, the court finds that summary judgment is not appropriate on Fourth Amendment grounds.  However, the court grants summary judgment on whether prison officials violated Ms. Gray's Fifth Amendment right against self incrimination and whether the Grays state an equal protection claim.

IT IS ACCORDINGLY ORDERED this 12th day of August, 2005, that the court grants in part and denies in part defendants' Motion for Summary Judgment (Dkt. No. 55).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

23